UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JOHN FUCHS, PATRICK MORIN, ANTHONY
MACAGNONE, MICHAEL CONROY, DAVID
HAINES, GEOFFREY JAMES, JAMES MALCOLM,
WILLIAM MACCHIONE, ALAN EHL, WILLIAM
WEITZMAN, FRANK WIRT, KEVIN HICKS,
JOSEPH OLIVIERI, DALE STUHLMILLER, ARTHUR
GODSELL, ROBERT CARLINO, PAUL J. O'BRIEN,
JR., JOSEPH GANIRO, ROSS PEPE, RICHARD
O'BEIRNE, JAMES LOGAN, ANTHONY
CAROPRESSO, ANTONIO MARTINS and TODD
HELFRICH, as Trustees of the EMPIRE STATE
CARPENTERS WELFARE, PENSION, VACATION,
ANNUITY, SCHOLARSHIP, APPRENTICE-TRAINING,
LABOR-MANAGEMENT COOPERATION and
CHARITABLE TRUST FUNDS,

                Plaintiffs,                    CV 06-1282 (ETB)

        -against-                        MEMORANDUM
                                                   OPINION, ORDER
                                                     AND JUDGMENT

TARA GENERAL CONTRACTING, INC.,

                Defendant.
------------------------------------------------------------------------x

Plaintiffs, The Trustees of the Empire State Carpenters employee benefit funds (the "Trustees"), bring this action to recover damages from defendant, Tara General Contracting, Inc. ("Tara Contracting"), for unpaid fringe benefit contributions, pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 and Sections 515 and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1145 and 1132(a). A bench trial was held before the undersigned on January 26, 2009.

Tara Contracting does not dispute that it is required to make fringe benefit contributions

-1-

to the various employee benefit funds. However, Tara Contracting challenges the methodology by which the hours worked and the benefits paid are recorded by the Trustees, asserting that it has paid all of the fringe benefit contributions owed.

FINDINGS OF FACT

I.  Introduction

On April 8, 2002, Tara Contracting, a New Jersey entity conducting business within the State of New York, entered into a collective bargaining agreement ("CBA") with the Empire State Regional Council of Carpenters (the "Union"), which was in effect from July 2000 to April 2004. (Tr. 11-12; Pl. Ex. 2; Joint Pre-Trial Order ¶ 7.)[1] Pursuant to the CBA, Tara Contracting was obligated to make monetary contributions, on a weekly basis, to certain employee fringe benefit funds (the "Funds") on behalf of its employees for every hour the employees worked. (Tr. 13.)

On April 30, 2004, Tara Contracting entered into an Extension Agreement with the Union, which extended the CBA another sixty (60) days, to June 30, 2004. (Tr. 16; Pl. Ex. 5.) A new CBA became effective between the parties on July 1, 2004 with an expiration date of April 30, 2007. (Tr. 17; Pl. Ex. 6.)

Tara Contracting also executed two compliance forms by which it became obligated to the terms of the CBA's governing Local 11 and Local 964, which are "sister local[]" unions of Tara Contracting's primary union, Local 7. (Tr. 14-15; Pl. Ex. 3-4.)

---

[1] References preceded by "Tr." are to pages of the transcript from the bench trial conducted on January 26, 2009.

II.   Testimony

   A.   Alan Ehl

Alan Ehl ("Ehl"), the Union's Regional Director for Long Island, testified that in 2002, Tara Contracting failed to pay all of the required fringe benefits for their employees. (Tr. 18-19.) As a result, by letter dated September 9, 2004, Ehl advised Tara Contracting that 383 hours in benefits for eight (8) employees was due and owing for the period July 29 to August 7, 2004. (Tr. 19; Pl. Ex. 7.) Ehl instructed Tara Contracting to remit payment immediately and that failure to do so would be considered a breach of the CBA. (Pl. Ex. 7.) Ehl did not receive any response to his September 9, 2004 letter. (Tr. 21.)

By letter dated September 15, 2009, Hope Brady ("Brady"), the Union's Collections Manager, advised Tara Contracting that, pursuant to the CBA, Tara Contracting was required to submit to an audit of its books and records for the period beginning January 1, 2002. (Tr. 20-21; Pl. Ex. 8.) The purpose of the audit was to determine whether Tara Contracting had made their required contributions to the Funds in accordance with the CBA. (Pl. Ex. 8.) Brady further advised Tara Contracting which records would be needed to conduct the audit and that failure to make the records available would constitute a breach of the CBA. (Pl. Ex. 8.) No response was received from Tara Contracting with respect to Brady's request for an audit. (Tr. 22.)

On September 27, 2004, Brady sent a second audit request letter to Tara Contracting. (Tr. 22-23; Pl. Ex. 10.) Similarly, on September 29, 2004, Ehl sent a second payment request to Tara Contracting for the 383 hours of fringe benefit contributions that were owed. (Tr. 21-22; Pl. Ex. 9.) Tara Contracting never complied with the Union's request for an audit. (Tr. 23.)

An audit of Tara Contracting's records was eventually conducted after the Union's

counsel at the time, Meyer, Suozzi, English & Klein, P.C. ("Meyer Suozzi"), sent a letter demanding one. (Tr. 23-24.) The audit was conducted by the Union's accounting firm, Schultheis & Panettieri, LLP ("Schultheis & Panettieri"), for the period January 1, 2002 to October 29, 2004 and determined that there was a fringe benefit deficiency owed by Tara Contracting in the amount of $23,624.31.[2] (Tr. 25-26.) By letter dated April 15, 2005, Brady notified Tara Contracting of the deficiency and provided them with a copy of the audit report. (Tr. 25-26; Pl. Ex. 11.) A second letter, dated June 2, 2005, from the Union's counsel, Meyer Suozzi, also advised Tara Contracting of the deficiency and provided them with a copy of the audit report. (Tr. 24; Pl. Ex. 12.) Both letters demanded payment of the outstanding deficiency on a timely basis to avoid further legal action. (Pl. Ex. 11-12.)

A meeting between Tara Contracting and the Union was subsequently held and a revised audit was conducted due to the discovery by Tara Contracting that payments to the Funds had in fact been made for certain employees who were listed in the initial audit. (Tr. 26-27.) By letter dated October 8, 2008, Brady advised Tara Contracting of the results of the revised audit, which found that the deficiency in fringe benefit contributions actually amounted to $12,828.88,[3] and provided them with a copy of the revised audit report. (Tr. 27-28; Pl. Ex. 13.) Brady instructed Tara Contracting to remit the amount owed within fourteen (14) days to avoid further legal action. (Pl. Ex. 13.) Brady further instructed Tara Contracting that if the amount of the

---

[2] The audit report indicates that, with interest, the amount actually due and owing amounted to $24,930.11. Additionally, if the debt was not paid within thirty (30) days, liquidated damages at a rate of twenty percent (20%) would be assessed, bringing the total amount due to $29,654.97. (Pl. Ex. 11.)

[3] The revised audit report indicates that with interest, the amount actually due and owing amounted to $14,061.38. (Pl. Ex. 13.)

deficiency was not received within fourteen (14) days, the Union would assess liquidated damages at a rate of twenty percent (20%), increasing the amount owed to $16,627.16. (Pl. Ex. 13.)

Ehl testified that for every job the Union has, it appoints one of its members to serve as a shop steward, whose responsibility is to keep track of the number of hours worked by every union member on that particular job. (Tr. 29,32.) The shop steward creates weekly time reports for the particular job they are assigned to that contain the members' names, their social security numbers or their United Brotherhood of Carpenters number, the local union number they belong to, the number of hours each member worked per day and whether the members received "stamps" for benefits.[4] (Tr. 29; Pl. Ex. 13.) The foreman on each job signs the shop steward reports before they are submitted to the Union, verifying their accuracy. (Tr. 30; Pl. Ex. 13.) Ehl testified that the purpose of the shop steward reports is to keep a "true and accurate report" of the number of hours being worked by each Union member. (Tr. 29.)

Regardless of what local union the member belongs to, benefits and wages are to be paid to or on behalf of the union members to the union who oversees the geographic location where the work is performed, which, in this case, was the Empire Carpenters Union, whose geographic territory includes Long Island. (Tr. 32.) According to Ehl, Tara Contracting failed to pay benefits on behalf of those union members who performed work on Long Island but belonged to Local 608, which is Manhattan's local union. (Tr. 33.) However, none of the shop stewards or

---

[4] Stamps are distributed to each union member covered by the CBA at the end of each pay period. The amount of stamps provided to each union member is determined by the number of hours the union member worked during that pay period. The union member then "redeems" the stamps at the Funds' office for credit to his or her benefit fund. (Tr. 93-94; Pl. Statement of Facts & Conclusions of Law 9 n.3.)

union members employed by Tara Contracting, including those belonging to Local 608, ever advised Ehl or filed a complaint asserting that they did not receive their wages or benefits. (Tr. 34, 47.)

B.   Stephen Bowen

Stephen Bowen ("Bowen"), the Director of Payroll Audit Services for Schultheis & Panettieri - the firm that conducted the two audits of Tara Contracting's books and records - testified that a payroll audit, also known as a compliance audit, is conducted to ensure that employers are paying benefits in compliance with their contracts with their particular unions. (Tr. 55-56.) Bowen confirmed that the audits conducted with respect to Tara Contracting indicated a deficiency in fringe benefit contributions initially found to be in the amount of $23,624.31 and then revised to $12,828.88. (Tr. 56-60.)

Bowen testified that as part of the audit, his firm conducted an on-site visit to Tara Contracting's place of business and reviewed their payroll and payroll tax records. (Tr. 57-58.) This information was compared with information provided by the Funds demonstrating the hours reported for benefits and the number of stamps purchased and redeemed as well as the shop steward reports. (Tr. 58, 68; Pl. Ex. 14.) Schultheis & Panettieri then compiled a list of the union members employed by Tara Contracting for whom benefits were due but not paid and calculated the total amount due for the time period audited. (Tr. 59; Pl. Ex. 11.)

Bowen testified that thereafter, the amount of unpaid benefits was decreased for two reasons: (1) certain Local 7 members who were listed in the initial audit provided additional information concerning redemptions of their benefits after the initial audit was conducted and (2) the hours for one union member, Diarmund Cronin ("Cronin"), were split into two categories -

hours reported to the New York District Council of Carpenters ("NYDCC") and additional hours that were not reported to the Funds or NYDCC. (Tr. 60-61, 64-66.) Tara Contracting was provided a credit for the hours Cronin worked that were reported to the NYDCC in an effort to "resolv[e] this matter unilaterally." (Tr. 62, 94.) This additional information was then included in Schultheis & Panettieri's calculations and the amount of outstanding fringe benefit contributions was reduced by approximately half. (Tr. 60-61; Pl. Ex. 13.) Schultheis & Panettieri did not receive any further information from Tara Contracting to warrant a further offset of the amount of fringe benefit contributions owed. (Tr. 77.) Bowen further testified that in response to issues raised by Tara Contracting that certain benefits were paid to the NYDCC for the Local 608 carpenters employed by Tara Contracting, Schultheis & Panettieri accessed the records for the NYDCC but found no such payments. (Tr. 108-09.)

      C.     <u>Gary Mare</u>

Gary Mare ("Mare"), a member and shop steward with the Local 7 union, testified that his responsibility as a shop steward is to record the hours worked by the union members, based on information provided by the union members for each particular job site. (Tr. 95-96, 99.) This information is then used to create the shop steward reports. (Tr. 96.) Mare identified the shop steward report that he created while employed by Tara Contracting - for a job that took place on November 11, 2003 - and testified that he had no reason to believe the report had been altered in any way since he created it. (Tr. 99-100; Pl. Ex. 13.) Mare further testified that prior to remitting the report to the union, he attempted to have the foreman on the job sign the report, but the foreman refused to do so. (Tr. 100.) Mare could not recall why the foreman refused to sign the shop steward report but testified that "it happens very often." (Tr. 100.) For the Local

608 members employed on the November 5, 2003 job, Mare testified that he was not provided with stamps for them and indicated such on the shop steward report by the notation "NA," meaning "Not Available." (Tr. 102.) Mare did not provide copies of his shop steward report to any of the Local 608 union members or the foreman on the job. (Tr. 103.) Mare testified that his understanding was that the employer was not supposed to receive a copy of the shop steward report.[5] (Tr. 103.)

### D. James Battistelli

James Battistelli ("Battistelli"), a member and shop steward with the Local 7 union, identified the shop steward report that he created while employed by Tara Contracting, for the week beginning August 23, 2004 (Tr. 119-20; Pl. Ex. 13.) Battistelli confirmed that the information provided on the shop steward report is accurate and that it was signed by the foreman on the job, verifying the hours that were worked. (Tr. 120-21.) Batistelli further testified that the stamps for that particular job were mailed to the union members, as reflected in the "remarks" section of his shop steward report. (Tr. 121.) According to Battistelli, Tara Contracting was "always behind on the benefits," such that the benefits were mailed to the union members rather than distributed to them with their wages, which is the usual practice. (Tr. 121-22.) Battistelli did not provide a copy of his shop steward report to the foreman on the job. (Tr. 123.)

---

[5] Subsequent testimony by defendant's witness, John Slattery, established that during a conference with the president of the Empire Carpenters Union, Slattery inquired as to the possibility of having the shop steward reports mailed to the employers if the foreman on the job does not receive a copy at the time he verifies and signs it. (Tr. 153-54.) Slattery testified that the union president responded that the shop steward reports are property of the union, not the employers. (Tr. 154.)

E.  Thomas Heltz

Thomas Heltz ("Heltz"), a member and shop steward with the Local 7 union, identified the shop steward reports that he created while employed with Tara Contracting, for the weeks beginning July 29, 2004 and August 5, 2004 . (Tr. 24-26; Pl. Ex. 13.)  Heltz testified that both reports were signed and verified by the foremen on the jobs.  (Tr. 127, 130; Pl. Ex. 13.)  Heltz further testified that with respect to the July 29, 2004 report, although the union members received their wages, they did not receive their stamps and were told that the stamps would be mailed to them.  (Tr. 127; Pl. Ex. 13.)  With respect to the August 5, 2004 report, Heltz testified that he was not paid for four (4) hours that he worked and two other union members did not receive paychecks at all.  (Tr. 128-29; Pl. Ex. 13.)  In addition, none of the union members received their stamps.  (Tr. 129; Pl. Ex. 13.)  Heltz did not provide a copy of his shop steward report to the foreman on the job but testified that had the foreman asked for a copy, he would have provided one.  (Tr. 130.)

F.  James Maler

James Maler ("Maler"), a member and shop steward with the Local 7 union, identified the shop steward report that he created while employed by Tara Contracting, for the week beginning August 4, 2003.  (Tr. 132-34; Pl. Ex. 13.)  Maler testified that for that particular job, both the stamps and the wages were mailed to the union members rather than distributed at the end of the pay week, as is the typical practice.  (Tr. 135.)  The foreman for the job signed and verified the shop steward report.  (Tr. 136; Pl. Ex. 13.)  Maler testified that he always offers the foreman on the job a copy of the shop steward report but if the foreman does not want a copy, he does not provide one.  (Tr. 138.)

G.  Linda Pywar

Linda Pywar ("Pywar"), a member and shop steward with Local 7, identified the shop steward report that she created while employed by Tara Contracting, for the week beginning October 9, 2002. (Tr. 139-42.) Pywar testified that although she received wages for this particular job, none of the union members received stamps, which is reflected by the notation "Not Available" on the shop steward report.[6] (Tr. 143.)

H.  John Slattery

The defendant's only witness was John Slattery ("Slattery"), Tara Contracting's outside accountant. (Tr. 144-45.) Slattery testified that in this capacity, his responsibilities consist of reviewing Tara Contracting's financial statements, preparing their tax returns, and assisting the office manager in any "problem areas" pertaining to "payroll, payroll taxes, union audits [or] insurance audits." (Tr. 145.) Slattery has worked with Tara Contracting continuously since 1998. (Tr. 145-46.)

Slattery testified that he was present during the Union audit of Tara Contracting conducted by Schultheis & Panettieri in 2005. (Tr. 146.) According to Slattery, Tara

---

[6] The Court notes that a review of the remaining shop steward reports contained in Plaintiff's Exhibit 13, for which no testimony was offered, reflect that stamps were not received by union members on a number of other occasions. Specifically, the shop steward report for the week beginning May 17, 2003 indicates that none of the union members received stamps for the hours worked. In addition, a notation on the report states "There have been no benefit stamps paid as yet!" (Pl. Ex. 13.) The shop steward report for the week beginning June 30, 2003 also indicates that stamps were not distributed to the union members. (Pl. Ex. 13.) Moreover, the shop steward reports for the weeks beginning September 8, 2003 and September 15, 2003, both state that stamps were not available when the union members were paid and that the members were "told stamps would be mailed." (Pl. Ex. 13.) Finally, the shop steward report for the week beginning October 2, 2003 states that the union members "were told the stamps would be sent" and that the shop steward "did not see or record any stamps." (Pl. Ex. 13.)

Contracting did not have copies of any of the shop steward reports pertinent to the audit prior to the time the audit was performed. (Tr. 146.) Rather, the first time that Tara Contracting received copies of the shop steward reports was when it received the audit report from Schultheis & Panettieri and Slattery requested that the "backup documentation" be provided as well. (Tr. 146-47.)

Slattery testified that after receiving the shop steward reports, he reviewed them and compared them to Tara Contracting's payroll reports. (Tr. 147.) Slattery further testified that all of Tara Contracting's payroll goes through the professional payroll company, ADP. (Tr. 147.) According to Slattery, ADP has a "relationship" or an "arrangement" with Local union 608, such that "the funds that are credited to the individual members are impounded from the Tara [Contracting] account and electronically wired over to the [NYDCC] so they get their money quickly and there[ is] no problem with [the] spelling of a name or the amounts or any transposition errors." (Tr. 147.) Slattery testified that this arrangement is "more efficient." According to Slattery, if a Local 608 member works for Tara Contracting, when their wages are paid, their benefits are automatically "impounded from the Tara [Contracting] bank account" as "part of the same process." (Tr. 147-48.) Slattery testified that this "process" was in effect during the audit period - January 2002 through October 2004. (Tr. 148.) Slattery did not believe that the same arrangement is in effect with the Empire State Carpenters' funds, which would include Local 7. (Tr. 159.)

Slattery further testified that in reviewing the audit conducted by Schultheis & Panettieri, for each individual union member listed in the audit, he compared the audit report to the shop stewards reports and then reviewed Tara Contracting's W2's for each particular year to

-11-

determine whether the union member was on Tara Contracting's payroll for that time. (Tr. 149.) When Slattery confirmed that an individual union member was indeed on the payroll, he went through the payroll week by week to confirm what weeks the union member was paid. (Tr. 149.) Slattery testified that he was easily able to trace union member Diarmund Cronin and confirm the payment of his benefits. (Tr. 149.)

With respect to other union members identified in the audit, however, such as Dermot Brennan, Bryan Michael, William Gardner and Patrick Healy, Slattery testified that it was not as easy to trace their employment. (Tr. 150-52.) According to Slattery, these individuals would sporadically show up on Tara Contracting's payroll, but the payroll did not match the week ending dates contained in the shop steward reports. (Tr. 150.) For example, these union members would show up on Tara Contracting's payroll on "week one," but the shop steward reports would report him as working during "week four" of Tara Contracting's payroll. (Tr. 150.) Slattery testified that since "there was no correlation," between the shop steward reports and Tara Contracting's payroll registers, he was unable to confirm these union members' employment and whether their benefits were paid. (Tr. 150, 155.) Slattery inquired of Tara Contracting's office manager as to whether there had been any complaints by any of the union members who had worked for them about not receiving their wages or benefits and was told that there had been none. (Tr. 154-55.)

Finally, Slattery testified that Tara Contracting maintains, as part of its billing system, its own reports that indicate the hours worked by the individual union members in a given week and where such hours were worked. (Tr. 165-66, 167-68, 171.) However, Slattery did not compare these reports to the shop steward reports to verify the hours worked. (Tr. 166, 171-72.)

According to Slattery, he "didn't deem it necessary" since he reviewed the payroll records. (Tr. 166-67.) Nor did Tara Contracting produce these records to Schultheis & Panettieri to dispute the results of the audit.[7] (Tr. 168-70.)

Tara Contracting did not offer any exhibits in support of its case.

CONCLUSIONS OF LAW

I.    ERISA

Section 515 of ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. "Section 502 of ERISA, 29 U.S.C. § 1132(a)(3), grants the trustees of a plan the right to bring an action in federal district court to enforce an employer's duty under section 515." Demolition Workers Union v. Mackroyce Contracting Corp., No. 97 Civ. 4094, 2000 WL 297244, at *2 (S.D.N.Y. Mar. 22, 2000) (citing Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 312-13 (2d Cir. 1990)). Here, neither party disputes the existence of a valid collective bargaining agreement between the parties or Tara Contracting's obligation to make the required contributions. (Joint Pre-Trial Order ¶ 7.)

Under ERISA, an employer also has certain record-keeping and reporting requirements: "[E]very employer shall, in accordance with regulations prescribed by the Secretary, maintain

---

[7] When asked why such records were not produced to Schultheis & Panettieri, Slattery responded, "We didn't show them a lot of records that we maintained. We gave them the records that they asked for." (Tr. 168.)

-13-

records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1). "This requirement forces employers 'to furnish to benefit plans the information needed for the plans' fulfillment of their reporting duties.'" Hanley v. Ocean Beach Club, Inc., No. 96 Civ. 4478, 1998 WL 65990, at *5 (S.D.N.Y. Feb. 18, 1998) (quoting Central States, S.E. & S.W. Areas Pension Fund v. Central Transport Inc., 472 U.S. 559, 573 (1985)). The parties herein do not dispute that Tara Contracting is obligated to maintain such records. (Joint Pre-Trial Order ¶ 7.)

"Since the employer is in the best position to know the number of hours worked, courts have determined that the policies of ERISA are advanced by the imposition of a burden that reflects the employer's duties under ERISA." Demolition Workers Union, 2000 WL 297244, at *7 (quoting Local 282 Welfare Trust Fund v. A. Morrison Trucking, Inc., No. CV-92-2076, 1993 WL 120081, at *1 (E.D.N.Y. Mar. 30, 1993)). Accordingly, while the Second Circuit has not specifically addressed the applicable standard where a benefit fund contests the amount of contributions owed by an employer, other circuits to consider the issue have held that where a benefit fund produces evidence "raising genuine questions concerning an employer's failure to maintain adequate records," the burden shifts to the employer to come forward with "evidence either of the precise number of hours worked or to negate the reasonableness of the inferences to be drawn from the plaintiff fund's evidence." Hanley, 1998 WL 65990, at *5 (citing Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc., 30 F.3d 692, 696-97 (6th Cir. 1994); Brick Masons Pension Trust v. Industrial Fence & Supply Inc., 839 F.2d 1333, 1338 (9th Cir.

1988); Combs v. King, 764 F.2d 818, 825-26 (11th Cir. 1985)).[8] "If the employer fails to produce such evidence, the court may award damages to the trustee[s] even where the damages are an approximate amount." Hanley, 1998 WL 65990, at *5 (citing Combs, 764 F.2d at 826). Several other courts within the Eastern and Southern districts have adopted and applied this burden-shifting analysis when deciding ERISA actions. See, e.g., Demolition Workers Union, 2000 WL 297244, at *7 (applying burden-shifting analysis and citing other cases that have done so); Local 282 Welfare Trust Fund, 1993 WL 120081, at *1 (applying burden-shifting analysis).

II.     Tara Contracting has Not Carried Its Burden

In the within action, plaintiffs demonstrated through both testimony and documentary evidence that Tara Contracting failed to pay $12,828.88 in fringe benefit contributions for the period January 1, 2002 to October 29, 2004. In support of their claim, plaintiffs offered the audit reports compiled by the accounting firm of Schultheis & Panettieri as well as the testimony of Stephen Bowen, the Director of Payroll Audit Services for Schultheis & Panettieri, who explained the steps taken to conduct the audit and how the auditors arrived at the amount of delinquent contributions due and owing. "Courts have found it appropriate to rely on an audit or an auditor's opinion to prove that defendant employers did not make required contributions to funds." Hanley, 1998 WL 65990, at *5 (quoting Grabois v. Action Acoustics, Inc., 94 Civ.

---

[8] While the Second Circuit has not specifically adopted a burden-shifting standard in the ERISA context, it has cited the cases discussed above with approval when discussing the allocation of burdens. See, e.g., LaBarbera v. J.D. Collyer Equip. Corp., 337 F.3d 132, 139 n.3 (2d Cir. 2003) (noting that "some courts have held that once trustees to an ERISA fund produce evidence raising genuine questions about the accuracy of a particular employer's records, the burden shifts to the employer to show the precise amount of work performed").

-15-

7386, 1995 WL 662127, at *5 n.3 (S.D.N.Y. Nov. 9, 1995) and citing cases). Accordingly, the Trustees herein have "raise[d] a genuine question[] concerning [defendant's] failure to maintain adequate records," thereby shifting the burden to Tara Contracting to refute the plaintiffs' evidence. Hanley, 1998 WL 65990, at *5.

Tara Contracting has failed to sustain its burden. Although defendant's witness, John Slattery, testified that Tara Contracting maintains its own reports that indicate, on a weekly basis, the number of hours worked by the individual union members it employs, (Tr. 165-66, 167-68, 171), no such evidence was offered to the Court as part of the defendant's case. Moreover, Slattery testified that despite the existence of these reports, he did not compare them to the shop steward reports to verify the hours worked as reported in the shop steward reports - deeming it unnecessary. (Tr. 166-67, 171-72.) Nor did Tara Contracting produce these records to Schultheis & Panettieri to dispute the results of the audit. (Tr. 168-70.)

Instead, Tara Contracting argues that the shop steward reports are inherently unreliable in that they can be fraudulently doctored to reflect hours that were not actually worked. However, Tara Contracting failed to offer any proof whatsoever to support this claim. Conversely, plaintiffs offered the testimony of five shop stewards who confirmed the accuracy of the shop steward reports that they created, which Tara Contracting failed to refute. At least one court within this circuit to consider the reliability of shop steward reports has held that "the weekly shop steward reports provide clear evidence of the actual number of hours worked on [a] project." Mason Tenders Dist. Council Welfare Fund v. Rubino, No. 99 Civ. 3294, 2002 U.S. Dist. LEXIS 24209, at *13 (S.D.N.Y. Dec. 13, 2002).

In addition, Tara Contracting argues that under a purported arrangement between its

payroll company, ADP, and the Local 608 union, it actually made the benefit contributions for the 608 union members it employed on job sites within the geographic location of the Empire Carpenters Union and therefore does not owe any outstanding contributions. However, Bowen testified that his firm attempted to locate any such payments by accessing the NYDDC's records and could not find any such payments. (Tr. 108-09). Moreover, although Slattery testified to this supposed arrangement, Tara Contracting offered nothing in the way of documentary evidence that would substantiate Slattery's testimony. Nor was any testimony or affidavit offered by a representative of ADP or the Local 608 union.

Based on the foregoing, I find that plaintiffs have made an adequate showing to sustain their burden as to unpaid fringe benefit contributions due and owing. Tara Contracting has failed to demonstrate that the amount of delinquent contributions calculated by the Trustees is inaccurate. Plaintiffs are therefore entitled to damages.

III. Damages

A. Delinquent Contributions

Pursuant to the audit conducted by Schultheis & Panettieri, the results of which I credit, the amount of delinquent fringe benefit contributions for the period January 1, 2002 to October 29, 2004 is $12,828.88. (Pl. Ex. 13.) Accordingly, judgment is granted in favor of plaintiffs in this amount.

B. Interest

Pursuant to ERISA, where judgment is entered in favor of a benefit plan, the plan is also entitled to an award of interest on the unpaid contributions. See 29 U.S.C. §

1132(g)(2)(B).  Under the terms of the CBA's in effect between the parties, interest is calculated at the prime rate per annum on the amount of outstanding fringe benefit contributions.  (Pl. Ex. 2 Art. VII; Ex. 6 Art. VII..)  To determine per diem interest, the amount of interest due on a per annum basis is divided by 365 days.  That amount is then multiplied by the number of days of delinquency.  As of April 9, 2009, the interest due and owing amounts to $3,370.65.[9]

Plaintiffs are also entitled to interest from April 9, 2009 through the date of judgment. According to the Wall Street Journal, the current prime rate of interest is 3.25%.  The per annum interest due on the amount of delinquent contributions therefore equals $416.94.  Divided by 365 days, the per diem interest amounts to $1.14 per day.  Accordingly, when multiplied by the number of days of delinquency from April 9, 2009 through the date of this Order - 152 days - the additional interest due equals $173.28.

Accordingly, plaintiffs are awarded interest on the unpaid contributions in the amount of $3,543.93.

    C.    <u>Liquidated Damages</u>

Where an employer fails to make the required fringe benefit contributions, ERISA also provides for an award of liquidated damages to the benefit plan:

> In any action under this title by a fiduciary for or on behalf of a plan to enforce section 515 in which a judgment in favor of the plan is awarded, the court shall award the plan -
>
>     \*    \*    \*
>
> (C) an amount equal to the greater of -
>     (i) interest on the unpaid contributions or,

---

[9] According to plaintiffs' post-trial papers, this figure was calculated using an interest rate of 5%.  (Pl. Statement of Facts & Conclusions of Law 20.)

> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent . . . of the amount [of unpaid contributions].

29 U.S.C. § 1132(g)(2)(C). The CBA's in effect between the parties contain similar provisions. (Pl. Ex. 2 Art. VII; Pl. Ex. 6 Art. VII.)

Plaintiffs herein are entitled to an additional award of interest since that amount is greater than twenty percent (20%) of the unpaid contributions. Accordingly, plaintiffs are awarded liquidated damages in the amount of $3,543.93.

### D. Attorney's Fees and Costs

Under ERISA, plaintiffs are also entitled to recover their "reasonable attorney's fees and costs of the action." 29 U.S.C. § 1132(g)(2)(D). The award of attorney's fees is "mandatory for suits involving delinquent employers." Iron Workers Dist. Council v. Hudson Steel Fabricators & Erectors, 68 F.3d 1502, 1506 (2d Cir. 1995); see also Cement & Concrete Workers Dist. Council Welfare Fund v. Baroco Contracting Corp., No. 08-cv-1671, 2009 U.S. Dist. LEXIS 27759, at *6 (E.D.N.Y. Apr. 2, 2009) (stating that ERISA "creates a mandatory right to . . . attorney's fees in any case in which judgment in favor of a plan is awarded"); Demopoulos v. Mystic Tank Lines Corp., No. 07 Civ. 9451, 2008 U.S. Dist. LEXIS 86129, at *11 (S.D.N.Y. Oct. 16, 2008) ("When a plaintiff prevails in an ERISA action for unpaid contributions, an award of attorneys' fees and costs . . . is mandatory."). While the award itself is mandatory, "the amount of any such award rests within the Court's discretion." Mason Tenders Dist. Council v. Aurash Constr. Corp., Nos. 05 Civ. 1891, 04 Civ. 2427, 2006 U.S. Dist. LEXIS 10250, at *7 (S.D.N.Y. Mar. 14, 2006) (quotation omitted).

Although plaintiffs herein are entitled to and request an award of attorney's fees and

costs, they did not submit the amount of fees incurred or any supporting evidence to substantiate their request. Accordingly, plaintiffs are awarded their reasonable attorney's fees and costs, the amount of which will be determined upon receipt of the appropriate documentary evidence. Plaintiffs are directed to make any such request within ten (10) days of the date of this Order.

JUDGMENT

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is granted in favor of the plaintiffs and that damages are awarded as follows: (1) unpaid fringe benefit contributions in the amount of $12,828.88; (2) interest in the amount of $3,543.93; (3) liquidated damages in the amount of $3,543.93; and (4) reasonable attorney's fees and costs, in an amount to be determined upon receipt of plaintiff's supporting documentation. Such documentation shall be filed within ten (10) days of the date of this Order.

The Clerk of the Court is directed to mark this case as closed.

**SO ORDERED:**

Dated: Central Islip, New York
September 8, 2009

/s/ E. Thomas Boyle
E. THOMAS BOYLE
United States Magistrate Judge